UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

DEREK CORE,

    Petitioner,

        v.         CAUSE NO. 3:19-CV-403-JD-MGG

WARDEN,

    Respondent.

## OPINION AND ORDER

Derek Core, a prisoner without a lawyer, filed an amended habeas petition under 28 U.S.C. § 2254 to challenge his conviction for robbery under Case No. 91D01-1310-FC-180. Following a jury trial, on May 29, 2014, the White Superior Court sentenced him as a habitual offender to twenty years of incarceration. In the habeas petition, Core argues that he is entitled to habeas relief because the police violated his Fourth Amendment right against unreasonable searches and seizures by conducting a traffic stop without reasonable suspicion of criminal activity.

## FACTUAL BACKGROUND

In deciding this habeas petition, the court must presume the facts set forth by the state courts are correct unless they are rebutted with clear and convincing evidence. 28 U.S.C. § 2254(e)(1). The Court of Appeals of Indiana summarized the evidence presented at trial:

> On October 3, 2013, Core, Omika Thurman, and Jason Roar traveled from Indianapolis to White County, Indiana, to rob a bank. Core had previously selected White County because Core believed that it would have fewer

officers than Indianapolis, which would translate into a longer police-response time to the robbery. White County also has access to Interstate 65, which Core believed would make it easier to flee from the crime. After Thurman had scoped out two banks, Core selected Farmers State Bank ("the Bank") in Brookston as the three's target because it had only two tellers, both of whom were female. After Core had selected the Bank but before the three effected the robbery, to help conceal Core's identity Thurman bought Core an Indianapolis Colts baseball cap. The two then attempted, with limited success, to remove the stitching on the cap "so it wouldn't be identifiable."

Shortly before 1:00 p.m., Core and Roar entered through the Bank's front doors, while Thurman, the getaway driver, waited outside in a Chevrolet Suburban. Once inside, Core-wearing sunglasses, embroidered jeans, gloves, the Colts baseball cap, and dark tennis shoes with white soles-jumped onto the counter and screamed at the tellers to "get back." Core and Roar then took money from the tellers' drawers, including certain sums of "bait" money. The two did not have bags and stuffed the money into their pockets. Core also took a bag that belonged to a teller, which, among other things, contained her driver's license and credit cards. Core and Roar then left the Bank and fled in the Suburban. Core directed Thurman to southbound State Road 43, which leads to Interstate 65.

Indiana State Trooper Darrick Scott received a call at his post, located on State Road 43 near Interstate 65, of a robbery in progress at the Bank. The call did not include any information about the getaway vehicle, but a later transmission stated that the two assailants were black males. Trooper Scott activated the lights and siren of his police vehicle and drove northbound on State Road 43. On his way to the Bank, Trooper Scott observed a number of vehicles pull off to the side of the road and yield the right of way to him. Most drivers of the yielding vehicles, he noticed, looked around inquiringly, but one driver, a female in a southbound Suburban later identified as Thurman, attempted to hide her face behind the vehicle's steering wheel and her left arm. Trooper Scott then checked his rearview mirror and noticed that the Suburban did not have a license plate attached to its rear bumper. Trooper Scott could see a silhouette in the Suburban's darkly tinted rear window but could not discern whether the vehicle had a license plate. At that time, Trooper Scott did not see anyone but Thurman in the Suburban.

Aware that a number of other officers were also in route to the Bank, Trooper Scott decided to make a U–Turn and "inquire more about the vehicle southbound that [he had] observed." As he pulled behind the

2

> Suburban, with lights and siren still activated, the vehicle reentered the roadway and began to flee southbound on State Road 43. As Trooper Scott pursued the vehicle, he eventually managed to get near enough to the rear of the vehicle to detect the numbers of a temporary license plate in the rear window.
>
> During the pursuit, Trooper Scott observed the Suburban speed, cross the center line, and fail to yield to him. Further, he saw the silhouettes of two men in the backseat of the Suburban, "popping up and down, just peeking and looking and observing to see what was going on." After several miles of pursuit, in which several other officers joined, officers disabled the Suburban. When the vehicle came to a stop, Core and Roar fled on foot, but officers apprehended both. Thurman remained in the Suburban.
>
> When apprehended, Core was wearing gloves, and officers recovered $7,267.00 on his person, which included the Bank's bait money. In a later inventory search of the Suburban, among other items, officers recovered a Colts baseball cap with the emblem partially removed, sunglasses, money ties with the Bank's emblem, a black leather bag, and several cards that evinced the name of the Bank's teller, whose bag was taken by Core during the robbery.
>
> On October 3, 2013, the State charged Core with two counts of robbery, one count as a Class C felony and one count as a Class B felony. And, on November 4, 2013, the State filed a third count that sought to have Core adjudicated an habitual offender.
>
> * * *
>
> At the conclusion of the trial, the jury convicted Core of robbery, as a Class C felony, but acquitted him of robbery, as a Class B felony, and Core admitted that he was an habitual offender. On May 28, the court held a sentencing hearing. . . . The court found that the aggravators outweighed the mitigators, and it sentenced Core to eight years executed in the Department of Correction, which it enhanced by an additional twelve years for a total aggregate term of twenty years executed.

ECF 11-6 at 2-8; *Core v. State*, 30 N.E.3d 787 (Ind. App. 2015).

## PROCEDURAL DEFAULT

Before considering the merits of a habeas petition, the court must ensure that the petitioner has exhausted all available remedies in state court. 28 U.S.C. § 2254(b)(1)(A); *Lewis v. Sternes*, 390 F.3d 1019, 1025 (7th Cir. 2004). For a federal court to hear his claims, a habeas petitioner must have fully and fairly presented his federal claims to the state courts. *Boyko v. Parke*, 259 F.3d 781, 788 (7th Cir. 2001). Fair presentment "does not require a hypertechnical congruence between the claims made in the federal and state courts; it merely requires that the factual and legal substance remain the same." *Anderson v. Brevik*, 471 F.3d 811, 814–15 (7th Cir. 2006) (citing *Boyko*, 259 F.3d at 788). It does, however, require "the petitioner to assert his federal claim through one complete round of state-court review, either on direct appeal of his conviction or in post-conviction proceeding." *Lewis*, 390 F.3d at 1025. "This means that the petitioner must raise the issue at each and every level in the state court system, including levels at which review is discretionary rather than mandatory. *Id.*

In the amended habeas petition, Core argues that the State court considered an obsolete version of the temporary license plate statute rather than the revised version, which became effective three months before the traffic stop. ECF 8 at 3. According to Core, the police officer represented that his basis for the traffic stop was that the vehicle did not have a license plate on the rear bumper and that he observed a license plate in the rear window. *Id.* Core also maintains that the amended version differed from the obsolete version by allowing motorists to display temporary plates in the rear window, so the police officer lacked a valid basis to conduct the traffic stop. *Id.*

4

By contrast, in his briefs on direct appeal, Core argued that his Fourth Amendment rights were violated because the police officer stopped the vehicle based solely on his observation that a black female seemed uncomfortable and did not have reasonable suspicion of a traffic violation. ECF 11-3 at 25-27; ECF 11-7 at 8-9. There, Core conceded that "the temporary license plate could have provided reasonable suspicion for a stop" and makes no mention of the different versions of the temporary license plate statute. ECF 11-3 at 26; ECF 11-7 at 8. Though they challenge the same traffic stop, the Fourth Amendment claim in the amended habeas petition is materially different than the Fourth Amendment claim presented to the State courts. Because Core did not present his habeas claim to the State courts, it is procedurally defaulted. Nevertheless, the court will consider the merits of his claim.[1]

## ANALYSIS

Core argues he is entitled to habeas relief because the police did not have probable cause for the traffic stop in violation of his rights under the Fourth Amendment. "The Fourth Amendment prohibits unreasonable searches and seizures." *Huff v. Reichert*, 744 F.3d 999, 1004 (7th Cir. 2014). "The Fourth Amendment permits brief investigative stops . . . when a law enforcement officer has a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Navarette v. California*, 572 U.S. 393, 396 (2014). "[T]o justify this type of seizure, officers need only reasonable suspicion—that is, a particularized and objective basis for

---

[1] Federal courts have the discretion to consider claims for habeas relief under certain circumstances even if such claims are procedurally barred. 28 U.S.C. § 2254(b)(2).

5

suspecting the particular person stopped of breaking the law." *Heien v. North Carolina*, 574 U.S. 54, 60 (2014). "Although a mere hunch does not create reasonable suspicion, the level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." *Navarette*, 572 U.S. at 397.

At a suppression hearing, Trooper Scott testified that, shortly before the traffic stop, he was informed by radio that a bank robbery had taken place nearby, and he activated the strobe lights on his vehicle to respond to the call. Trial Tr. 6-10. He initiated the traffic stop of Core's vehicle because he believed that the driver was trying to conceal her face as he passed the vehicle and because there was no license plate on the rear part of the vehicle. *Id.* at 9-13. He testified that he could see the outline of what might have been a temporary license plate but could not verify it due to the dark tint of the rear window. *Id.* at 12-13, 25. Photographs of the vehicle corroborate Trooper Scott's testimony regarding the window tint and its impact on the visibility of the license plate. Trial Ex. 35; Trial Ex. 38.

Three months before the traffic stop, on July 1, 2013, Indiana revised its statute on the display on license plates with minor additions as follows:

> Sec. 26. (a) License plates, *including temporary license plates,* shall be displayed as follows:
>
> > (1) For a motorcycle, trailer, semitrailer, or recreational vehicle, upon the rear of the vehicle, except as provided in subdivision (4).
> >
> > (2) For a tractor or dump truck, upon the front of the vehicle.

6

> (3) For every other vehicle, upon the rear of the vehicle, except as provided in subdivision (4).
>
> (4) For a truck with a rear mounted forklift or a mechanism to carry a rear mounted forklift or implement, upon the front of the vehicle.
>
> (b) A license plate shall be securely fastened, in a horizontal position, to the vehicle for which the plate is issued:
>
> > (1) to prevent the license plate from swinging;
> >
> > (2) at a height of at least twelve (12) inches from the ground, measuring from the bottom of the license plate;
> >
> > (3) in a place and position that are clearly visible;
> >
> > (4) maintained free from foreign materials and in a condition to be clearly legible; and
> >
> > (5) not obstructed or obscured by tires, bumpers, accessories, or other opaque objects.
>
> (c) *An interim license plate must be displayed in the manner required by IC 9-32-6-11(f).*
>
> *(d) The bureau may adopt rules the bureau considers advisable to enforce the proper mounting and securing of license plates on vehicles consistent with this chapter.*

Ind. Code § 9-18-2-26 (2013) (newly added language in italics). Prior to this amendment, Indiana courts had held that" [p]lacing a license plate on the inside of the back window clearly does not satisfy the requirement that license plates be displayed upon the rear of the vehicle." *Meredith v. State*, 906 N.E.2d 867, 872 (Ind. 2009). The revised statute refers to Ind. Code § 9-32-6-11, which allows dealers to provide interim license plates to buyers or lessors and provides that they may be displayed "in a location on the left side

of a window facing the rear of the motor vehicle that is clearly visible and unobstructed."

To start, the record contains nothing to suggest that the vehicle had an interim license plate from a dealer rather than a temporary license plate. To the contrary, both Trooper Scott and Core in his habeas petition and throughout the State court proceedings described the license plate as temporary, so Core has not demonstrated that Ind. Code § 9-32-6-11 applies. *See e.g.,* ECF 8; ECF 11-3, ECF 11-7; ECF 13, ECF 20. Even if it does, Trooper Scott's testimony and the photographs included in the trial exhibits show that the license plate was not clearly visible due to the tinted windows. Further, even if Trooper Scott initiated the traffic stop based on a faulty understanding of the temporary license plate statute, "reasonable suspicion can rest on a mistaken understanding of the scope of a legal prohibition." *Heien v. North Carolina*, 574 U.S. 54, 60 (2014); *but see Darringer v. State*, 46 N.E.3d 464, 474 (Ind. App. 2015) ("stopping the vehicle based upon the failure to mount the interim plate on the bumper" was not a reasonable mistake of law after the statute had been in effect for almost one year). Therefore, the argument that the police lacked reasonable suspicion to conduct a traffic stop is not a basis for habeas relief.

## CERTIFICATE OF APPEALABILITY

Pursuant to Section 2254 Habeas Corpus Rule 11, the court must grant or deny a certificate of appealability. To obtain a certificate of appealability under 28 U.S.C. § 2253(c), the petitioner must make a substantial showing of the denial of a constitutional right by establishing "that a reasonable jurist could debate whether (or, for that matter,

8

agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). For the reasons explained in this order, there is no basis for encouraging Core to proceed further.

For these reasons, the court DENIES the habeas corpus petition; DENIES a certificate of appealability pursuant to Section 2254 Habeas Corpus Rule 11; and DIRECTS the clerk to enter judgment in favor of the Respondent and against the Petitioner.

SO ORDERED on March 9, 2021

/s/JON E. DEGUILIO
CHIEF JUDGE
UNITED STATES DISTRICT COURT